## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

LAURA DOMBROWSKI,

      Plaintiff/Counterclaim Defendant,

v.                                      Case No. 18-11615

UNITED STATES OF AMERICA,

      Defendant/Counterclaim Plaintiff.

_____/

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Laura Dombrowski brings this quiet title action against Defendant United States of America under 28 U.S.C. § 2410(a)(1) for property on which Plaintiff resides and to which she has legal title. (ECF No. 1.) Defendant asserts Plaintiff's property is subject to a federal tax lien. Defendant counterclaims under 26 U.S.C. § 7403(a) to enforce its lien. (ECF No. 5.)

Plaintiff has lived with Ronald Matheson since 2006. Matheson has accumulated substantial debts to the federal government, and Defendant seeks to collect some of the amounts owed, and filed a lien on Plaintiff's property. Plaintiff moves for summary judgment of her claim to invalidate the lien. (ECF Nos. 31, 32.) Defendant moves for summary judgment on its counterclaim to enforce the lien. (ECF No. 30.) The matter has been thoroughly briefed. (ECF Nos. 35, 36.) The court finds a hearing unnecessary, and for the reasons provided below, the court will grant in part and deny in part Plaintiff's motion and deny Defendant's motion. E.D. Mich. L.R. 7.1(f)(2).

## I. BACKGROUND

The following facts are taken from the record established by both parties. Each fact is either agreed upon or lacks contradictory evidence.

Plaintiff and Matheson have lived together since 2006. (ECF No. 30, PageID.258, ¶ 1; ECF No. 32, PageID.517, ¶ 1.) They are not married. (ECF No. 30, PageID.258, ¶ 1; ECF No. 30-1, PageID.292; ECF No. 32, PageID.517, ¶ 1.)

In July 2006, Plaintiff lent Matheson $171,000. (ECF No. 30, PageID.259, ¶¶ 5-7; ECF No. 30-1, PageID.297-98; ECF No. 32, PageID.517, ¶¶ 5-7.) The amount constituted the entirety of Plaintiff's retirement account. (ECF No. 30, PageID.259, ¶ 5; ECF No. 30-1, PageID.297-98; ECF No. 32, PageID.517, ¶ 5.) The loan was short-term; Matheson promised to pay it back within months. (ECF No. 30-1, PageID.297-98; Defendant's Exhibit 2, Page 25.) One year later, in July 2007, Matheson gave Plaintiff a promissory note for the loan, backdated to July 2006 and providing for 100% interest. (ECF No. 30, PageID.259, ¶ 9; ECF No. 32, PageID.517, ¶ 9; ECF No. 33, PageID.601.)

Around the same time as Plaintiff's loan in July 2006, Plaintiff's brother loaned Matheson $172,000 at an interest rate of 100%. (ECF No. 30, PageID.260, ¶ 11; Defendant's Exhibit 2, Page 44; ECF No. 33, PageID.607; ECF No. 32, PageID.518, ¶ 11.)

Later in 2006, Plaintiff again loaned Matheson money. She wrote Matheson a check for $50,000 and wrote the word "loan" in memo line. (ECF No. 30-1, PageID.319; ECF No. 33, PageID.611.)

2

In October 2007, Matheson wrote checks to Plaintiff and her brother to pay off the loans. (ECF No. 30, PageID.260, ¶ 12; ECF No. 30-3, PageID.384, 86; ECF No. 32, PageID.518, ¶ 12.) Matheson gave the checks to Plaintiff and instructed her not to cash them. (ECF No. 30, PageID.260, ¶ 15; Defendant's Exhibit 2, Page 41; ECF No. 32, PageID.518, ¶ 15.) Matheson indicated that he had no money to pay the check amounts. (ECF No. 30, PageID.260, ¶ 15; Defendant's Exhibit 2, Page 41; ECF No. 32, PageID.518, ¶ 15.)

Both Plaintiff and Plaintiff's brother continued to loan Matheson money. In November 2007, Plaintiff's brother made a $10,000 loan to Matheson. (ECF No. 30, PageID.260, ¶ 16; ECF No. 30-11, PageID.475; ECF No. 32, PageID.518, ¶ 16.) In December 2010, Plaintiff loaned Matheson $10,600. (ECF No. 30, PageID.260-61, ¶ 17; ECF No. 30-1, PageID.297; ECF No. 32, PageID.519, ¶ 17.)

During the course of these events, Matheson steadily amassed substantial debt to the federal government. Matheson incurred income tax liabilities for tax years 2001, 2003, 2004, 2007, and 2010. (ECF No. 30, PageID.261, ¶ 18; ECF No. 32, PageID.519, ¶ 18.) From 2009 to 2012, Matheson was in litigation with the Internal Revenue Service ("IRS") to contest his income tax deficiencies. (ECF No. 30, PageID.261, ¶¶ 19-23; ECF No. 32, PageID.519, ¶¶ 19-23.) By 2011, Matheson had self-reported over $1,250,000 in tax liabilities on his tax return. (ECF No. 30, PageID.261, ¶ 22; ECF No. 32, PageID.519, ¶ 22.) He submitted an offer-in-compromise to settle all his tax debts on April 10, 2013. (ECF No. 30, PageID.262, ¶ 24; ECF No. 32, PageID.519, ¶ 24.) The IRS rejected the offer. (ECF No. 30, PageID.262, ¶ 24; ECF No. 32, PageID.519, ¶ 24.)

Matheson's tax liabilities now stand at $3,237,039.91. (ECF No. 30, PageID.262, ¶ 18; ECF No. 32, PageID.519, ¶ 18.)

In the spring of 2013, Matheson defaulted on the mortgage for his residence. (ECF No. 30, PageID.262, ¶ 28; ECF No. 32, PageID.519, ¶ 28.) Both Plaintiff and Matheson resided on the property. (ECF No. 30, PageID.258, ¶ 4; ECF No. 32, PageID.517, ¶ 4.)

On June 25, 2013, Matheson transferred $220,000 to Plaintiff. (ECF No. 30, PageID.262, ¶ 29; ECF No. 32, PageID.519, ¶ 29.) That same day, Matheson transferred $80,000 to Plaintiff's brother. (ECF No. 30, PageID.262, ¶ 30; ECF No. 32, PageID.519, ¶ 30.) Both Plaintiff and Plaintiff's brother claim the amounts were partial repayments for their loans made to Matheson in the past. (ECF No. 30-11, PageID.483; ECF No. 32, PageID.519, ¶ 29.)

On June 27, 2013, Plaintiff's brother gave Plaintiff the $80,000 he received from Matheson. (ECF No. 30, PageID.262, ¶ 31; ECF No. 32, PageID.520, ¶ 31.) On July 10, 2013, Plaintiff purchased a house. (ECF No. 30, PageID.263, ¶ 32; ECF No. 32, PageID.520, ¶ 32.) The cost of the property was $229,990.98. (ECF No. 30, PageID.263, ¶ 32; ECF No. 32, PageID.520, ¶ 32; ECF No. 33, PageID.636.) Plaintiff received a warranty deed in her name. (ECF No. 30, PageID.263, ¶ 32; ECF No. 32, PageID.520, ¶ 32; ECF No. 33, PageID.634.)

Since at least October 1, 2013, Matheson has resided with Plaintiff on the property. (ECF No. 30, PageID.263, ¶ 34; ECF No. 32, PageID.520, ¶ 34.)

In July 2017, the IRS placed a lien on Plaintiff's property. (ECF No. 33, PageID.638.) Plaintiff brought this action for quiet title to the property and asked the

4

court to hold the lien invalid. (ECF No. 1, PageID.4-5.) The IRS argued that Plaintiff

assisted Matheson in tax evasion and sought to collect its debts. It counterclaimed to

enforce the tax lien. (ECF No. 5, PageID.22-25.)

## II.  STANDARD

To prevail on a motion for summary judgment, a movant must show—point out—

that "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the

initial burden of presentation that "demonstrate[s] the absence of a genuine issue of

material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no

requirement, however, that the moving party "support its motion with [evidence]

negating the opponent's claim." *Id.* (emphasis removed); *see also Emp'rs Ins. of

Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing

that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (quoting Fed. R. Civ. P. 56(e)).

This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere

possibility' of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v.

Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). For a court to deny summary

judgment, "the evidence [must be] such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson*, 477 U.S. at 248. All reasonable inferences from the

underlying facts must be drawn "in the light most favorable to the party opposing the

motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

## III. DISCUSSION

Defendant supports its lien under state law, as is required. Defendant relies on Matheson's tax debts to assert a property interest over Plaintiff's home. Although federal law governs income tax liabilities, state law determines the property interests of taxpayers upon which tax liabilities attach. "In the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property." *United States v. Nat. Bank of Comm.*, 472 U.S. 713, 722 (1985) (quoting *Aquilino v. United States*, 363 U.S. 509, 513 (1960)). "Once it has been determined that state law creates sufficient interests in the taxpayer to satisfy the requirements of the statute, state law is inoperative, and the tax consequences thenceforth are dictated by federal law." *Id.* (quoting *United States v. Bess*, 357 U.S. 51, 56-57 (1958)); *Hatchett v. United States*, 330 F.3d 875, 881 (6th Cir. 2003) (quoting *United States v. Craft*, 535 U.S. 274, 278 (2002)) (analogizing property interests to a "bundle of sticks" and reasoning: "State law determines only which sticks are in a person's bundle.").

Defendant asserts three theories in support of its lien on Plaintiff's property. It argues Matheson's transfer of $300,000 on June 17, 2013 violates Michigan's Uniform Voidable Transfers Act, Mich. Comp. Laws § 556.35(2). Defendant also asks the court to impose a resultant trust on Plaintiff's property. Finally, it argues the lien is proper under a nominee theory of liability. The court will address each argument in turn.

## A. Michigan Uniform Voidable Transfers Act

Defendant relies on the Michigan Uniform Voidable Transfers Act's bar on

"insider" fraudulent transfers. Mich. Comp. Laws § 566.35(2) states:

> A transfer made by a debtor is voidable as to a creditor whose claim arose
> before the transfer was made if the transfer was made to an insider for an
> antecedent debt, the debtor was insolvent at that time, and the insider had
> reasonable cause to believe that the debtor was insolvent.

Defendant must prove four elements: 1) that Matheson transferred the $300,000 to an

"insider"; 2) that the transfer was made to pay an antecedent debt; 3) that Matheson

was insolvent at the time he made the transfers; and 4) that the alleged recipient of the

funds, Plaintiff, had reasonable cause to believe Matheson was insolvent. *Id.*

### 1. Statute of Limitations

Plaintiff first argues Defendant is barred by a statute of limitations. Insider

fraudulent transfer actions must be brought "within 1 year after the transfer was made or

the obligation was incurred." Mich. Comp. Laws § 566.39(b); *Zervos Grp., Inc. v.*

*Thompson Asphalt Prod., Inc.*, No. 265397, 2006 WL 1156369, at *7 (Mich. Ct. App.

May 2, 2006).

However, "[i]t is well settled that the United States is not bound by state statutes

of limitation or subject to the defense of laches in enforcing its rights." *United States v.*

*Summerlin*, 310 U.S. 414, 416 (1940). Plaintiff admits this, but contends that

Defendant's asserted rights are not based on any federal statute, and thus the

exemption does not apply. Plaintiff points to *United States v. California*, 507 U.S. 746

(1993) in which the Supreme Court applied a state statute of limitations to a suit by the

federal government. There, the government was subrogated to the position of a private

contractor after the government indemnified the contractor's debt. *Id.* at 748-49. The

Court noted that the general principle against applying state statue of limitations existed in situations where "the right at issue was obtained by the [g]overnment through, or created by, federal statute," and in situations where "the [g]overnment was proceeding in its sovereign capacity." *Id.* at 757.

Even if the Court's language in *California* created an affirmative requirement that all federal actions be derived from federal statute, it does not support Plaintiff's argument. Defendant's rights to reimbursement have federal statutory support. Title 26 U.S.C. § 7403(a) gives Defendant the right to sue "to enforce a lien of the United States." Federal statute created the income tax and imposes obligations on individuals to pay it. *See* 26 U.S.C. § 1 ("Tax imposed"). Defendant is acting in its "sovereign capacity" and through rights "created by . . . federal statute." *California*, 507 U.S. at 757. As the Sixth Circuit has said, "state law determines what constitutes a fraudulent conveyance [for tax collection purposes], but federal law determines the timeliness of the action . . . the United States is not bound by [a state's] statute of limitations." *United States v. Isaac*, 968 F.2d 1216 (Table), at *2 (6th Cir. 1992); *see also United States v. Parker House Sausage Co.*, 344 F.2d 787 (6th Cir. 1965) (holding, in an action by the United States to collect a tax debt, that "[t]he United States is not barred in an action brought to enforce its claim by a state statute of limitations"). Michigan's statute of limitations does not apply.

### 2.  "Insider" Transfer

Plaintiff does not contest that three of the four requirements for insider fraudulent transfer are met in this case. She presents no argument that Matheson's payment of $200,000 was not made to pay an antecedent debt, that Matheson was insolvent at the

time of the payment, and that Plaintiff had reasonable cause to know of Matheson's insolvency when she received the funds.[1] Mich. Comp. Laws § 566.35(2) (ECF No. 32, PageID.524-26; ECF No. 36, PageID.976-77.) The only issue the court is asked to decide is whether Plaintiff qualified as an "insider" under Michigan law. Mich. Comp. Laws § 566.35(2).

Mich. Comp. Laws § 566.31(h) provides a definition for "insider." It states:

'Insider' includes all the following:

(*i*) If the debtor is an individual, all of the following:

(A) A relative of the debtor or of a general partner of the debtor.

(B) A partnership in which the debtor is a general partner.

(C) A general partner in a partnership described in sub-subparagraph (B).

(D) A corporation of which the debtor is a director, officer, or person in control.

. . .

(*iv*) An affiliate, or an insider of an affiliate as if the affiliate were the debtor.

Mich. Comp. Laws § 566.31(h).

---

[1]     There is substantial evidence to support these conclusions. Plaintiff herself claims that the $220,000 paid to her and the $80,000 paid to her brother (subsequently given to Plaintiff) were payments for prior loans to Matheson. (ECF No. 30-11, PageID.483; ECF No. 32, PageID.519, ¶ 29.) Defendant has also submitted uncontested evidence that Matheson had accumulated debt millions of dollars in excess of his assets at the time of the transfer, and thus was insolvent; and that Plaintiff was presented with substantial evidence of and knew of Matheson's insolvency at the time of the transfer. Mich. Comp. Laws § 566.32(1) ("A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets.") (ECF No. 30, PageID.259-62, ¶¶ 5-7, 11, 16-17, 22, 28; Defendant's Exhibit 2, Page 11; ECF No. 30-6, PageID.439; ECF No. 32, PageID.517-19, ¶¶ 5-7, 11, 16-17, 22, 28.)

Plaintiff asserts that she can be an insider only if she fits within one of the four specific categories of insiders the statute lists for "individual" debtors. Mich. Comp. Laws § 566.31(h)(*i*). However, the statute states that an insider "includes" all the categories listed. Mich. Comp. Laws § 566.31(h). "Include" is not an exclusive term; it is defined as "to place, list, or rate as a part or component of a whole or of a large group." *Include*, Webster's Third New International Dictionary, Unabridged (2020). Categories listed in Mich. Comp. Laws § 566.31(h) are merely "components of a whole" and serve as common examples of what constitutes an "insider." *See Grand Trunk W. R.R. Co. v. U.S. Dep't of Labor*, 875 F.3d 821, 824 (6th Cir. 2017) (quoting *King v. Burwell*, 135 S.Ct. 2480, 2489 (2015)) ("If the statutory language is plain, we must enforce it according to its terms."). The Michigan Court of Appeals has come to the same conclusion. *Schilkey v. Prosper Mgmt., LLC*, No. 327243, 2016 WL 6395595, at *3 (Mich. Ct. App. Oct. 27, 2016) (quoting *Dillard v. Schlussel*, 865 N.W.2d 648, 658 (Mich. Ct. App. Oct. 21, 2014)) ("We conclude that the language of the statute is not limited to only the enumerated categories of what constitutes an "insider" under [Mich. Comp. Laws §] 566.31 . . . particularly when it is clear that the UFTA is designed 'to prevent debtors from transferring their property in bad faith before creditors can reach it.'). The definition of "insider" for individuals is not limited to the four categories listed under Mich. Comp. Laws § 566.31(h)(*i*).

Defendant argues that Plaintiff falls within a category of insiders called "affiliates." Mich. Comp. Laws § 566.31(h)(*iv*). Under the Michigan statute, an "affiliate" includes "[a] person whose business is operated by the debtor under a lease or other agreement, or

a person substantially all of whose assets are controlled by the debtor."[2] Mich. Comp.

Laws § 566.31(a)(*iii*).

At the time of Matheson's transfer, Plaintiff had $10,427.09 in her bank account.

(ECF No. 30-6, PageID.440.) She was unemployed and reported her taxable income for

2013 as $1,332. (ECF No. 30, PageID.264, ¶ 43; ECF No. 30-10, PageID.455; ECF No.

32, PageID.521, ¶ 43.) Plaintiff has presented evidence that her mother gave her

$100,000 in 2004 and she received $210,000 from the 2006 sale of her condominium.

(ECF No. 33, PageID.544, 614, 803.) However, Defendant still argues Plaintiff was

without any substantial assets by the time of the transfer in 2013. When Matheson

transferred the money to Plaintiff and her brother, Plaintiff had loaned Matheson her life

savings, and a total of $231,600, at a minimum. (ECF No. 30, PageID.259, ¶¶ 5-7; *id.*,

PageID.260-61, ¶ 17; ECF No. 30-1, PageID.297-98; ECF No. 32, PageID.517, ¶¶ 5-7;

*id.*, PageID.519, ¶ 17; ECF No. 33, PageID.611.) With interest, Defendant calculates

Matheson owed Plaintiff $450,000. (ECF No. 30, PageID.270.) With almost all of

Plaintiff's cash in the hands of Matheson, Defendant argues Matheson "controlled"

"substantially all of [Plaintiff's] assets" under Mich. Comp. Laws § 566.31(a)(*iii*).

A reasonable jury could find that Matheson controlled substantially all of

Plaintiff's assets. *Anderson*, 477 U.S. at 248. With only $10,427.09 in her bank account,

---

[2]      Plaintiff contends that "affiliate" applies only to businesses or those with whom
the debtor has a business relationship. (ECF No. 32, PageID.525-26.) Although it may
be true that in practice most "affiliates" have only a commercial relationship with the
debtor, the statute makes no such distinction. Plaintiff cites no case law standing for that
proposition. "Affiliate" includes all "person[s]" who have "substantially all of [their] assets
. . . controlled by [a] debtor." Mich. Comp. Laws § 566.31(a)(*iii*). The court will not
amend the plain language of the statute by imposing an atextual requirement that the
alleged affiliate is limited to one that is in a commercial relationship with the debtor.
*Grand Trunk W. R.R. Co.*, 875 F.3d at 824.

no interests in real property, and all major cash infusions occurring seven to nine years prior, a fact finder could reasonably infer that Plaintiff had all her assets under the control of Matheson by 2013. *Id.* (ECF No. 30-6, PageID.440; ECF No. 33, PageID.544, 614, 803.) While Matheson owed Plaintiff hundreds of thousands of dollars, he could essentially decide whether or not to repay Plaintiff with little to no consequence. In fact, Matheson had derogated his responsibility to pay his debts for many years. (ECF No. 30, PageID.259, ¶¶ 5-7; *id.*, PageID.251, ¶ 18; *id.*, PageID.262, ¶ 29; ECF No. 30-1, PageID.297-98; ECF No. 32, PageID.517, ¶¶ 5-7; *id.*, PageID.519, ¶¶ 18, 29.) The only record before the court that Matheson *ever* attempted to repay Plaintiff prior to the 2013 transfer were checks that Matheson specifically instructed Plaintiff not to cash because they could not be honored. (ECF No. 30, PageID.260, ¶ 15; Defendant's Exhibit 2, Page 41; ECF No. 32, PageID.518, ¶ 15.) Although Plaintiff held assets through her rights to Matheson's repayment, they were a far cry from commercial securities; viewing the evidence in the light most favorable to Defendant, a reasonable juror could well conclude that they were not worth as much as the paper they were printed on. *Anderson*, 477 U.S. at 248; *Moran*, 788 F.3d at 204.

On the other hand, a reasonable juror could find that Matheson did not control "substantially all" of Plaintiff's assets. Mich. Comp. Laws § 566.31(a)(*iii*); *Anderson*, 477 U.S. at 248. It is uncontested that Plaintiff lacked much cash, and the cash she did have, around $10,000, paled in comparison to the $450,000 potentially due from Matheson. (ECF No. 30, PageID.270; ECF No. 30-6, PageID.440.) It may also be reasonably inferred that Plaintiff would have had difficulties trading her loans to third parties in exchange for cash or other, more stable, assets. Nonetheless, the statute

does not state that Matheson must control "substantially all [of the alleged affiliate's] *liquid* assets," it focuses more broadly on "substantially all [of the alleged affiliate's] assets." Mich. Comp. Laws § 566.31(a)(*iii*). Defendant argues that Plaintiff was owed $450,000 by the time of Matheson's transfers. (ECF No. 30, PageID.270.) Plaintiff's right to this money cannot be simply ignored. A reasonable juror, viewing the evidence in the light most favorable to Plaintiff, could conclude that Matheson did not control "substantially all" of Plaintiff's assets. Mich. Comp. Laws § 566.31(a)(*iii*); *Anderson*, 477 U.S. at 248; *Moran*, 788 F.3d at 204. Although much rested on Matheson's willingness to abide by his promises, a jury could conclude that Plaintiff held assets outside of Matheson's "control," namely rights to repayment, that were not substantially overvalued by the cash Plaintiff transferred to Matheson previously.

Although Plaintiff does not contest most elements of insider fraudulent transfer, a jury must decide the question whether Plaintiff was, in fact, an "insider" under Michigan law. Mich. Comp. Laws § 566.35(2). Specifically, a jury must decide whether Matheson controlled "substantially all" of Plaintiff's assets at the time of Matheson's transfers. Mich. Comp. Laws § 566.31(a)(*iii*). Thus, summary judgment in favor of either Plaintiff or Defendant is inappropriate. Fed. R. Civ. P. 56(a).

## B.  Resulting Trust

Defendant next asserts that Plaintiff's property is subject to a resulting trust under Mich. Comp. Laws § 555.8. The legal theory of resulting trusts has a long history. *See Fairbairn v. Middlemiss*, 47 Mich. 372, 374 (1882) ("[S]tatutes . . . recognize and sustain certain trusts in favor of creditors where the consideration emanates from the debtor and the grant is made to another.") It has seen little use in modern times. The most

recent case citing Mich. Comp. Laws § 555.8 or its predecessor statutes, in both state and federal court, is 1974. *Advance Dry Wall Co. v. Wolfe-Gilchrist, Inc.*, 218 N.W.2d 866, 868 (Mich. Ct. App. 1974).

Mich. Comp. Laws § 555.7 establishes a default rule. Title in property vests in the grantee of the property. *Id.* Whether a third-party or the grantee paid the consideration to obtain the property is irrelevant; title and ownership is not affected. *Id.* ("[N]o use or trust shall result in favor of the person by whom such payment shall be made; but the title shall vest in the person named as the alienee in such conveyance.").

Mich. Comp. Laws § 555.8 creates an exception. It states:

> Every such conveyance [described in Mich. Comp. Laws § 555.7] shall be presumed fraudulent, as against the creditors of the person paying the consideration; and when a fraudulent intent is not disproved, a trust shall result in favor of such creditors, to the extent that may be necessary to satisfy their just demands.

*Id.* A trust arises in favor of a debtor's creditors when the debtor pays for property subsequently titled under a third-party's name. *Id.*; *see Advance Dry Wall Co.*, 218 N.W.2d at 868 ("[The] statute would create an equitable interest in [purchased] land in favor of [a] . . . creditor since the valuable consideration for the land was paid for by [the debtor] but the title was taken exclusively in the names of [third-parties]."). Such a transaction creates a presumption of fraudulent intent, and it is the third-party's responsibility to produce evidence to rebut it. Mich. Comp. Laws § 555.8.

Here, Plaintiff asserts that Matheson's transfers in June 2013 were repayments of debts owed to Plaintiff and her brother. If this were true, the cash used to pay for Plaintiff's property was her own. It was either directly transferred to her in performance of a contractual obligation (the $220,000 wired to Plaintiff), or given to her by her

brother, after her brother had obtained legal title to the money through performance of his own contractual obligation (the $80,000). A reasonable juror could conclude that Mich. Comp. Laws § 555.8 does not apply. *Anderson*, 477 U.S. at 248. Mich. Comp. Laws § 555.8 grants rights to "creditors of the person paying the consideration." Here, a reasonable juror could find that Plaintiff held rightful ownership of the cash used to pay the consideration for the property. *Anderson*, 477 U.S. at 248. Plaintiff is undeniably not a creditor of Defendant. Defendant presents no evidence that Plaintiff owed money to the IRS. Defendant's tax lien is supported by Matheson's, not Plaintiff's tax liabilities. If Plaintiff paid for the property with her own money and is not indebted to Defendant, there would arise no presumption of fraudulent intent. Defendant would not be entitled to a resulting trust.

However, a reasonable juror could also conclude that Matheson's payments to Plaintiff and her brother were a sham, merely disguised attempts to evade taxes, not repayments for prior loans. Mich. Comp. Laws § 555.8; *Anderson*, 477 U.S. at 248. Matheson did not pay Plaintiff or her brother any of the amounts they purportedly lent to Matheson for many years. It is claimed that Plaintiff lent Matheson $221,000 in 2006 and $10,600 in 2010, while Plaintiff's brother lent Matheson $172,000 in 2006 and $10,000 in 2007. (ECF No. 30, PageID.259-60, ¶¶ 5-7, 11, 16-17; ECF No. 30-1, PageID.297-98, 319; ECF No. 32, PageID.517-19, ¶¶ 5-7, 11, 16-17; Defendant's Exhibit 2, Page 44; ECF No. 33, PageID.607.) Yet the debts were not repaid until 2013, and then only partially, and subject to conditions. (ECF No. 30, PageID.262, ¶¶ 29-30; ECF No. 32, PageID.519, ¶¶ 29-30.) Matheson gave Plaintiff checks to repay Plaintiff and her brother in 2007, but contemporaneously informed her there was no money from

which to draw and satisfy them. (ECF No. 30, PageID.260, ¶ 15; Defendant's Exhibit 2, Page 41; ECF No. 32, PageID.518, ¶ 15.) At the time of the transfers in 2013, Matheson had recently defaulted on his mortgage to his residence. (ECF No. 30, PageID.262, ¶ 28; ECF No. 32, PageID.519, ¶ 28.) It was also three months after the IRS had refused Matheson's offer-in-compromise to settle his outstanding tax debts. (ECF No. 30, PageID.262, ¶ 24; ECF No. 32, PageID.519, ¶ 24.) At the same time as when Matheson may have been looking for a residence, and the prospects of settlement in his tax dispute may have appeared bleak, he transferred to Plaintiff, the woman with whom he was living, the exact sum of money necessary to purchase a new home. (ECF No. 30, PageID.263, ¶ 32; ECF No. 32, PageID.520, ¶ 32; ECF No. 33, PageID.636.) Plaintiff then purchased the new home in her own name, thereby avoiding massive tax debts Matheson would still have been forced to pay were he to have purchased the home himself. (ECF No. 30, PageID.263, ¶ 32; ECF No. 32, PageID.520, ¶ 32; ECF No. 33, PageID.634.)

A reasonable juror could examine the timing of Matheson's payments, his motive in purchasing a new home, his long history of non-payment to Plaintiff and her brother, and his substantial tax liabilities, and conclude that the $300,000 Matheson paid to Plaintiff and her brother was not to repay loans, but to funnel Matheson's money out of his hands and safely away from the IRS. *Anderson*, 477 U.S. at 248. If at the time of the property purchase, the $300,000 was, in fact, Matheson's, and Plaintiff was a mere conduit without any legal interest, then Matheson paid the consideration for property titled in Plaintiff's name. That would trigger Mich. Comp. Laws § 555.8. Without proof negating fraudulent intent, Defendant, as Matheson's creditor, benefits from a resulting

trust on Plaintiff's property. In that event, Defendant's lien could be enforced. 26 U.S.C. § 7403(a); Mich. Comp. Laws § 555.8.

Nonetheless, the court cannot conclude as a matter of law that Matheson's payments were fraudulent and made merely to purchase the property without tax consequences. Fed. R. Civ. P. 56(a). Evidence shows that Plaintiff and Plaintiff's brother loaned Matheson money on repeated occasions and Matheson had agreed to pay the money back. (ECF No. 30, PageID.259-60, ¶¶ 5-7, 9, 11, 16-17; ECF No. 30-1, PageID.297-98, 319; ECF No. 32, PageID.517-19, ¶¶ 5-7, 9, 11, 16-17; Defendant's Exhibit 2, Page 44; ECF No. 33, PageID.601, 607.) If a jury credits this evidence, Plaintiff and Plaintiff's brother would have had legally enforceable rights. The $300,000 used to pay for Plaintiff's property would be Plaintiff's, not Matheson's and Mich. Comp. Laws § 555.8 would not apply. To the contrary, a reasonable juror could instead conclude that Plaintiff and Plaintiff's brother had no expectations of repayment, or that, further, their payments to Matheson were not loans at all. *Anderson*, 477 U.S. at 248. If so, a reasonable juror could view the series of transfers that led to the purchase of Plaintiff's property as a form of money laundering, not payments for legally collectable debt. *Id.* The money used to purchase Plaintiff's property would be Matheson's and Mich. Comp. Laws § 555.8 would apply.

There remains a genuine issue of fact. Fed. R. Civ. P. 56(a). The court will not enter summary judgment in favor of either Plaintiff or Defendant and Defendant's request for a resulting trust will require trial.

### C.  Nominee Theory

Defendant's third argument is that Plaintiff served as a nominee for Matheson, and the property purchased by Plaintiff is subject to Matheson's debt obligations. Defendant cites a case from this district, *Porta-John of America Inc. v. United States*, 4 F.Supp.2d 688, 701 (E.D. Mich. 1998) (Edmunds, J.). There, a corporation indebted to the IRS transferred a substantial amount of its assets to a sister corporation, owned and controlled by the same individuals who owned and controlled the debtor corporation. *Id.* at 689-90, 701. The court analyzed Michigan's law for piercing the corporate veil. *Id.* at 700. It disregarded the sister corporation's status a separate entity and imposed the debtor corporation's debts on the sister corporation's assets. *Id.*

Drawing on federal revenue caselaw that "the [IRS] may collect the tax debts of a taxpayer from the assets of his nominee, instrumentality, or alter ego," the court in *Porta-John* analyzed the corporate relationships under a theory of nominee liability. *Id.* at 700 (citing *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51 (1977); *Lemaster v. United States*, 891 F.2d 115 (6th Cir. 1989)). The court relied on no Michigan law for its determination. *Id.* at 701. It relied upon opinions from the Northern District of New York, the District of Montana, and the Second Circuit, to set the following standard for nominee liability:

> In order to establish that property is held by a nominee, the [c]ourt must consider six factors: (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

*Id.* at 701 (citing *Libutti v. United States*, 968 F.Supp. 71, 76 (N.D.N.Y. 1997); *Towe Antique Ford Found. v. IRS*, 791 F.Supp. 1450, 1454 (D. Mont. 1992); *LiButti v. United States*, 107 F.3d 110, 119-20 (2d Cir. 1997)). The *Porta-John* court found the sister corporation had received assets for inadequate consideration and was a nominee subject to debtor corporation's tax debt. *Id.*

Defendant asserts that it may attach a lien to Plaintiff's property using the *Porta-John* nominee liability standard. However, federal law does not establish Defendant's rights to Plaintiff's property; state law does. "In the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property." *United States v. Nat. Bank of Comm.*, 472 U.S. 713, 722 (1985); *Drye v. United States*, 528 U.S. 49, 58 (1999) ("We look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation.").

Specifically, in *Isaac*, 968 F.2d 1216 (Table), the Sixth Circuit analyzed an IRS claim of fraudulent transfer of property to avoid federal taxes. The court there reiterated the binding nature of state law and stated that "state law determines what constitutes a fraudulent conveyance." *Id.* at *2. The court analyzed the property transfer under Kentucky's law of fraud. *Id.* at *4.

"Faithful application of a state's law requires federal courts to anticipate how the relevant state's highest court would rule in the case, and in doing so we are bound by controlling decisions of that court." *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607 (6th Cir. 2012) (citations removed). "Federal courts should be extremely cautious

about adopting substantive innovation in state law." *Id.* at 608 (citations removed). Yet no Michigan court has ever cited to *Porta-John*, and no Michigan court has relied on its nominee liability theory to find an individual or corporation liable for a fraudulent conveyance. *Porta-John* itself did not utilize Michigan law to develop its standard on nominee liability and conducted no analysis as to whether the Michigan Supreme court would approve of it. *Porta-John*, 4 F.Supp.2d 688; *Berrington*, 696 F.3d at 607.

That is not to say *Porta-John* was wrongly decided. To the contrary, the court dedicated most of its analysis to corporate veil piercing under Michigan law. *Porta-John*, 4 F.Supp.2d at 700-01. The court discussed nominee liability in two paragraphs at the end of its opinion. *Id.* at 701.

The *Porta-John* court performed this analysis because of a nominee theory reference in federal revenue caselaw. *Id.* 700-01. The court cited the Supreme Court decision *G.M. Leasing Corp.* and the Sixth Circuit decision *Lemaster* to support the uncontested position that an alter-ego, such as a nominee, could be held liable for another's tax debts. *Porta-John*, 4 F.Supp.2d at 700; *see G.M. Leasing Corp.*, 429 U.S. at 351 ("If [the third party] was [the debtor's] alter ego, it had no countervailing effect for purposes of his federal income tax."); *Lemaster*, 891 F.2d at 119 ("The tactic of proceeding against the nominee of a taxpayer for the purpose of satisfying the taxpayer's tax obligations had also been upheld by post-*G.M. Leasing* circuit court decisions."). These cases do not state that alter-ego liability can be imposed *only* through nominee theories. They refer to nominee liability simply to reiterate a general principle: if the applicable state law incorporates a nominee theory of liability, the IRS can use it to collect tax debts against third parties who may themselves owe no debt to

20

the IRS. That in no way conflicts with well-established law that "state law controls in determining the nature of the legal interest which the taxpayer had in . . . property." *Nat. Bank of Comm.*, 472 U.S. at 722.

In Michigan, nominee theory as articulated in *Porta-John* has not yet been endorsed or applied. State law controls Plaintiff's property rights and the legal basis upon which Defendant can enforce a tax lien. *Nat. Bank of Comm.*, 472 U.S. at 722. Defendant cannot rely on a standard foreign to Michigan jurisprudence, noted briefly in a federal district court opinion.

Neither the Sixth Circuit nor the Supreme Court have endorsed or applied the *Porta-John*'s nominee standard in tax cases arising under Michigan property law. In fact, the Sixth Circuit has discussed *Porta-John* one time, in *Spotts v. United States*, 429 F.3d 248 (6th Cir. 2005). There, the Sixth Circuit reversed a district court decision that analyzed tax liability under *Porta-John*. *Id.* at 253. The court stated: "Because there is no indication that the district court applied [applicable state] law [on constructive trusts] before determining the scope of the federal tax lien[,] we must reverse." *Id.*

The Sixth Circuit mentioned that some courts have applied the *Porta-John* factors when evaluating questions of alter-ego liability. *Id.* at 253 n.2. Nonetheless, the *Spotts* court noted that "federal courts have looked to the decisions of other courts for guidance" only when "a forum state does not have clear law on the issue." *Id.* at 253. The court held that a state did have "clear law" where it allowed the IRS to enforce its rights to tax debts through a constructive trust on third-party property. *Id.* Further, the court cautioned, even in cases where law outside the forum state can be used, "rigid adherence to [the *Porta-John*] factors may not be appropriate for every case." *Id.* at 253

n.2. The unique facts of a case may not fit well within *Porta-John*'s factors, such as when the alleged nominee is a spouse, and courts may disregard *Porta-John* as needed. *Id.*

Defendant has presented arguments under an "insider" theory of fraudulent conveyance and Michigan's law of resulting trusts. Both allow Defendant to collect tax debts from a taxpayer's alter-ego, here Matheson allegedly using Plaintiff to purchase property and avoid income tax liability. If Defendant is successful at trial, it can properly impose a tax lien on Plaintiff's property, despite Plaintiff herself owing nothing to Defendant.

Michigan has "clear law" on alter-ego liability.[3] *Spotts*, 429 F.3d at 253. Because *Porta-John*'s nominee theory is not derived from Michigan state law, summary judgment in favor of Plaintiff will be granted. *Nat. Bank of Comm.*, 472 U.S. at 722; Fed. R. Civ. P. 56(a). There are no factual issues, and as a matter of law, Defendant's *Porta-John* argument fails. Fed. R. Civ. P. 56(a).

## IV. CONCLUSION

Defendant supports its tax lien on Plaintiff's property through "insider" fraudulent transfer, the formation of a resulting trust, and a nominee theory articulated in *Porta-*

---

[3]      In addition to "insider" fraudulent conveyance law and resulting trusts, Michigan's Uniform Voidable Transfer Act also allows creditors to void transfers made by debtors "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Mich. Comp. Laws § 566.34(1)(a). In making this determination, courts consider, among other factors, whether: "[t]he transfer . . . was to an insider"; "[t]he debtor retained possession or control of the property transferred after the transfer"; "[b]efore the transfer was made . . . the debtor had been sued or threatened with suit"; and "[t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred." Mich. Comp. Laws § 566.34(2). While this standard is similar to *Porta-John*, it is not the same. 4 F.Supp.2d at 701. Defendant chose to enforce its lien under *Porta-John*, not under Mich. Comp. Laws § 566.34.

*John of America Inc. v. United States*. Genuine issues of fact remain as to whether

Plaintiff was an "insider" and whether a resulting trust is applicable. Mich. Comp. Laws §

566.35(2); Mich. Comp. Laws § 555.8; Fed. R. Civ. P. 56(a). As a matter of law,

Defendant cannot support its lien through a *Porta-John* nominee theory, which falls

outside Michigan law.

Defendant's motion for summary judgment will be denied. Summary judgment

will be entered in favor of Plaintiff on Defendant's *Porta-John* argument. On all other

issues, Plaintiff's motion for summary judgment will be denied. Accordingly,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment (ECF Nos. 31, 32)

is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment

(ECF No. 30) is DENIED.

s/Robert H. Cleland                     /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  May 18, 2020

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, May 18, 2020, by electronic and/or ordinary mail.

s/Lisa Wagner                               /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\18-11615.DOMBROWSKI.CrossSummaryJudgment.RMK.2.RHC.docx