**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

LAURA DOMBROWSKI,

      Plaintiff/Counter-Defendant,

v.                                                                          Case No. 18-11615

UNITED STATES OF AMERICA,

      Defendant/Counter-Plaintiff.

_____/

### FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO RULE 52(a)

      Following summary judgment practice, the court held that the case presented questions of fact which must be resolved through trial. The court held a bench trial on April 18–19, 2022. Pursuant to Federal Rule of Civil Procedure 52(a), the court presents its findings of facts and conclusions of law. For the reasons that follow, the court finds in favor of Defendant.

### I. INTRODUCTION

      Plaintiff Laura Dombrowski brought this quiet title action against Defendant United States of America under 28 U.S.C. § 2410(a)(1) for property on which Plaintiff resides and to which she has legal title. Plaintiff lived with Ronald Matheson from 2006 until his death in January 2022. Over time, Matheson accumulated substantial debts to the federal government, and Defendant seeks to collect some of the amounts owed. Consequently, Defendant filed a federal tax lien on Plaintiff's property, claiming Matheson has an interest in the property. Defendant brought a counterclaim under 26 U.S.C. § 7403 to enforce its lien.

On May 18, 2020, the court entered an order denying Defendant's motion for summary judgment and granting in part Plaintiff's motion for summary judgment. The court held that there were genuine issues of material fact as to whether Plaintiff was an "insider" under Michigan's Uniform Voidable Transfers Act ("MUVTA"), Mich. Comp. Laws § 556.35(2), or whether the property at issue was subject to a resulting trust under Mich. Comp. Laws § 555.8. The court also rejected Defendant's attempt to advance its claim that its lien was proper under a "nominee theory" of liability, as such a theory was unsupported by Michigan law.

As explained in the Joint Final Pretrial Order, the issues of law to be litigated at trial were whether (1) Plaintiff was an "insider" of Matheson, and whether Matheson's transfer of $300,000 on June 25, 2013, violated the MUVTA, Mich. Comp. Laws § 566.35(2); (2) whether Matheson received reasonably equivalent value in exchange for his transfer of $300,000 on June 25, 2013, and whether the transfer violated the MUVTA, Mich. Comp. Laws § 566.35(1); (3) whether a resulting trust in favor of Defendant attaches to the property at issue; and (4) whether a constructive trust attaches in favor of Defendant to the property at issue.

## II. FINDINGS OF FACTS

The parties stipulated to many of the facts relevant to this cause of action. The court accepts the relevant stipulated facts as a portion of its findings of fact. In addition to the stipulated facts, the court makes various supplemental findings of fact based on the record and witness testimony at trial.[1]

---

[1]     The following findings of fact were either stipulated to or found by the court by clear and convincing evidence. At trial, the parties disputed whether the government's burden of proof is clear and convincing or preponderance of the evidence, particularly

1.  Ronald Matheson and Plaintiff were never married.

2.  Matheson and Plaintiff were not related to each other through consanguinity.

3.  Matheson and Plaintiff lived together from 2006 until January 13, 2022, the date of Matheson's death.

4.  Matheson and Plaintiff had a close relationship, consisting of a nearly three decade long personal, loving relationship.

5.  Matheson and Plaintiff never maintained joint bank accounts together, but they were financially entangled. Through the years they had co-signed checks, were jointly listed on insurance policies, and held joint title on a truck.

6.  In 1997, Matheson designated Plaintiff as a contingent beneficiary to his $4.67 million trust benefit plan and described her as his "significant other."

7.  In 2006, Matheson borrowed approximately $1.7 million to purchase a residence located at 49464 Goulette Point Dr., Chesterfield, MI 48047 (the "Goulette Property").

8.  The loan for the Goulette Property was in Matheson's name alone, but Matheson and Plaintiff held title to the Goulette Property jointly.

9.  In 2006, Plaintiff moved into the Goulette Property with Matheson and quit her job because Matheson "wanted [her] to take care of the house."

---

as it applies to its claims under MUVTA. As the court analyzed and held on the record, the applicable standard is preponderance of the evidence. Even if the court applied the higher standard, the government nonetheless sustained its burden by clear and convincing evidence.

10. On July 17, 2006, Plaintiff issued a personal check to Auto/Con Corporation—an entity Matheson formerly co-owned and of which he was president—in the amount of $171,000.

11. Plaintiff obtained the $171,000 from money she withdrew from her retirement account, and the withdrawal depleted her entire retirement savings.

12. According to Plaintiff, Matheson was supposed to repay the $171,000 within approximately 60 days.

13. Although Plaintiff testified that the purpose of the check was to "loan" money to Matheson so that he could demonstrate to a lender or creditor that one of his business entities had funds in a bank account, the court does not find Plaintiff's characterization of the payment as a genuine "loan" credible.

14. Plaintiff provided the $171,000 as a capital investment in World Access Lottery Group ("WALG"), an entity formed in 2006 and closed in 2009, the business of which revolved around the Russian lottery industry.

15. Matheson opened a bank account for WALG and had sole signature authority on it.

16. Matheson, along with an individual named Bradford Romano, was a "managing member" of WALG.

17. The capital investment monies provided by Plaintiff and her family members (as explained below) to Matheson, were subsequently used by Matheson for charter capital in WALG.

18. The $171,000 was not returned to Plaintiff within 60 days of July 17, 2006, and because she did not have enough money to replace the money withdrawn from

her retirement account within, she was assessed a tax penalty for making an early withdrawal from her retirement account for the 2006 tax year.

19. Matheson executed a promissory note in favor of Plaintiff in the amount of $172,000; the "loan date" was written as July 13, 2006. The note stated that Matheson promised to pay Dombrowski $172,000 plus 100% interest (i.e., another $172,000) by July 13, 2007. The note was prepared and signed in July 2007, but the signatories to the note (Plaintiff, Matheson, and Virginia Dombrowski) backdated it by writing the date of July 13, 2006 next to their signatures. The note also provided that in return for Dombrowski's initial capital investment of $171,000, she would "retain" a .860% interest in WALG.

20. Plaintiff, prior to investing in WALG, had at some point invested in a company called HydroScience, which was associated with Matheson and Romano. This company had failed, and Plaintiff received no return on her investment.

21. In July 2006, Matheson also received $172,000 from Virginia Dombrowski, Plaintiff's mother, to secure financing for WALG.

22. Matheson prepared but did not execute a promissory note in favor of Virginia Dombrowski in the amount of $172,000; the note is not signed by any party. The note stated that Matheson promised to pay Virginia Dombrowski $172,000 plus 100% interest (i.e., another $172,000) by July 13, 2007 and also provided that in return for Virginia Dombrowski's initial capital investment of $172,000, she would "retain" a .860% interest in WALG.

23. In July 2006, Mark Dombrowski, Plaintiff's brother, provided $172,000 to Matheson for an investment. The check was written to Auto/Con, and the memo line of the check read "Promisary [sic] Note."

24. Matheson executed a promissory note in favor of Mark Dombrowski in the amount of $172,000. The note stated that Matheson promised to pay Mark Dombrowski $172,000 plus 100% interest (i.e., another $172,000) by July 13, 2007. The note also provided that in return for Mark Dombrowski's initial capital investment of $172,000, he would "retain" a .860% interest in WALG. The only signatory to the note, Matheson, wrote the date of July 13 next to his signature, but did not write the year.

25. None of the promissory notes were recorded in a county recorder office.

26. Matheson did not fulfill his promise to repay Dombrowski the $171,000 within 60-80 days, nor the promise set forth in his promissory note to Plaintiff to pay her $172,000 plus 100% interest by July 13, 2007.

27. On October 9, 2006, Plaintiff issued another personal check, this time directly to Matheson, in the amount of $50,000; she wrote the word "loan" in the check's memo section.

28. Plaintiff obtained the $50,000 from the October 4, 2006 sale proceeds of her condominium, which she sold for $210,000. She was the sole owner of the condominium.

29. The $210,000 that Plaintiff received from the sale of her condominium was almost completely spent or otherwise disposed of by Plaintiff prior to June 22,

2013. At about that time, Plaintiff's Fifth Third bank account had a balance of $10,427.09.

30.  On or about October 2, 2007, Matheson wrote two checks from WALG's bank account to Plaintiff for $389,000 and $1,900,000. Matheson wrote "Capital Return" in the memo line of the $389,000 check, and Matheson wrote "Distribution" in the memo line of the $1,900,000 check.

31.  On or about October 2, 2007, Matheson wrote two checks from WALG's bank account to Virginia Dombrowski for $389,000 and $950,000. Matheson wrote "Capital Return" in the memo line of the $389,000 check, and Matheson wrote "Distribution" in the memo line of the $950,000 check.

32.  On or about October 2, 2007, Matheson wrote two checks from WALG's bank account to Mark Dombrowski for $389,000 and $950,000. Matheson wrote "Capital Return" in the memo line of the $389,000 check, and Matheson wrote "Distribution" in the memo line of the $950,000 check.

33.  Matheson gave these six checks to Plaintiff.

34.  Plaintiff testified that when she saw the amount written on the checks, she did not believe that she could cash them as they did not seem legitimate.

35.  At the time he gave her the checks, Matheson instructed Plaintiff not to cash them because he knew the payor account had no funds in it. Plaintiff thus knew the payor account for the six checks (the WALG account) did not have money in it at that time.

36.  None of these six checks were ever cashed.

37. On November 7, 2007, Mark Dombrowski wrote a personal check to Matheson in the amount of $10,000.

38. On October 3, 2008, Mark Dombrowski purported to apply for a wire transfer to Matheson in the amount of $128,000; there is no indication in the application that the wire transfer was completed or would have been made as a loan.

39. On December 20, 2010, Plaintiff issued a personal check directly to Matheson for $10,660 and wrote the word "loan" in the check's memo section. The purpose of the payment was to help Matheson make an offer-in-compromise ("OIC") to the government to settle his tax debts. At this time, Plaintiff was aware that Matheson needed the money because he owed money to the government, particularly for tax debts.

40. Matheson had incurred income tax liabilities for tax years 2001, 2003, 2004, 2007, and 2010, and the amount of that liability totals $3,237,039.91 plus statutory additions and interest accruing from and after July 17, 2018.

41. From 2009 to 2012, Matheson was in litigation with the Internal Revenue Service ("IRS") regarding his income tax deficiencies and the IRS' efforts to collect those liabilities.

42. In 2009, Matheson filed a petition in U.S. Tax Court to contest his liability for income taxes and penalties for the years 2001, 2002, 2003, and 2004.

43. On October 12, 2009, Matheson stipulated to entry of a judgment by the United States Tax Court, No. 482-09, for deficiencies in income tax due for tax years 2001, 2002, 2003, and 2004 in the amounts of $56,208, $1,579, $528,204, and $71,536 respectively, as well as an addition to tax for 2001 in the amount of

$14,052, and penalties for 2001, 2002, and 2003 in the amounts of $11,241, $315.80, and $105,640.80, respectively, for a grand total of $788,776.60.

44. On December 28, 2009, the IRS made assessments of taxes, interest, and penalties against Matheson for the years 2001, 2003, and 2004, in accordance with the Tax Court Order described above.

45. On May 28, 2010, Matheson requested a Collection Due Process hearing from the IRS to challenge levies issued by the IRS to collect his tax liabilities.

46. On February 8, 2011, Matheson submitted an OIC to the IRS for tax years 2001, 2003, 2004, and 2007.

47. On February 21, 2011, the IRS made assessments of taxes and interest against Matheson for the year 2007 in the amount of $10,000.44.

48. On October 17, 2011, Matheson filed his tax year 2010 return reporting $1,233,286 in tax liability, yet only $66,016 was paid by him via withholding. As a result, on November 21, 2011, the IRS assessed tax, failure to pay tax penalties, and interest for the year 2010 in the amount of $1,238,741.2.

49. On February 3, 2012, the IRS rejected Matheson's 2011 OIC.

50. In March 2012, the Collection Due Process levy hearing for the 2001, 2003, and 2004 tax years was no longer pending with the IRS.

51. On May 11, 18, and 24, 2012, respectively, the IRS issued Matheson a notice of levy, filed a notice of federal tax lien, and issued Matheson a lien filing collection due process notice all for his 2010 tax liabilities.

52. On May 28, 2012, the IRS sent Matheson a statutory notice of intent to levy relative to his 2004 tax liabilities.

53. On or before April 10, 2013, Matheson submitted a second OIC to the IRS for his 2001, 2003, 2004, and 2007 tax liabilities, as well as an OIC for his 2010 tax liabilities that the IRS subsequently rejected.

54. On April 15, 19, and 25, 2013, respectively, the IRS issued Matheson a notice of levy, filed a notice of federal tax lien, and issued Matheson a lien filing collection due process notice all for his 2007 tax liabilities.

55. As of July 2013, the tax assessments described above for 2001, 2003, 2004, 2007, and 2010 totaled at least $2,275,966.20 plus further interest accrued after assessment; those assessments were unpaid as of July 2013; those assessments remained unpaid through the time Matheson ultimately consented to judgment relative to these assessments for the total amount of $3,237,039.91; and those assessments remain unpaid.

56. Matheson formed RRM Energy, LLC on November 8, 2012.

57. RRM's Articles of Organization list "Ronald R. Matheson" as RRM's registered agent and list 49464 Goulette Point Dr. as RRM's registered office, the same address as the Goulette Property occupied by Matheson and Plaintiff at the time RRM was formed in 2012.

58. RRM Energy never made "any income" or at most made a "very little amount."

59. In the spring of 2013, just before Matheson and Plaintiff moved into the Stillwater Property, Matheson defaulted on his $1.7 million mortgage with PNC Bank on the Goulette Property occupied by Matheson and Plaintiff. Plaintiff was aware of Matheson's default.

60. On May 7, 2013, RRM Energy, LLC's bank account had a $353.34 balance.

61.  On May 8, 2013, a $713,000 check was deposited into the RRM Energy, LLC bank account.

62.  On June 25, 2013, Matheson, through his RRM Energy account, wired $220,000 to Plaintiff. Just prior to this transfer, Plaintiff had $10,427.09 in her account.

63.  Given the circumstances, and considering their close relationship, Plaintiff believed or had reasonable cause to believe Matheson was insolvent at the time Matheson transferred money to Dombrowski through RRM Energy's account.

64.  On June 27, 2013, two days after Matheson wired $80,000 to Mark Dombrowski, Mark Dombrowski withdrew $80,000 from his Comerica Bank account and provided that money to Plaintiff.

65.  RRM Energy, LLC had a $692,531.95 balance in its account on June 7, 2013 and a $215,338.91 balance on July 6, 2013.

66.  Dombrowski purchased property at 54213 Stillwater Drive, Macomb, Michigan 48042 (the "Stillwater Property") on July 10, 2013.

67.  Dombrowski paid $300,000 to purchase the Stillwater Property.

68.  Matheson provided the $300,000 used to purchase the Stillwater Property through direct and indirect means.

69.  Plaintiff knew or had reasonable cause to know of Matheson's tax debts before the purchase of the Stillwater Property.

70.  Shortly before Plaintiff moved into the Stillwater Property, she and Matheson were evicted from the Goulette Point Property which was foreclosed upon.

71. Plaintiff received a warranty deed to the Stillwater Property. She recorded the deed in the Macomb County Register of Deeds on July 25, 2013.

72. Matheson moved into the Stillwater Property on or about October 1, 2013, after PNC Bank foreclosed on the Goulette Property.

73. Matheson resided at the Stillwater Property until his death.

74. Matheson did not hold record title to the Stillwater Property.

75. Plaintiff pays the property taxes and the homeowners association fees for the Stillwater Property.

76. Plaintiff pays the gas and electric bills for the Stillwater Property.

77. From the time Plaintiff moved into the house in 2013, Matheson paid the phone bill, cable bill, repairs on the house and appliances, and miscellaneous food expenses. They did not have an agreement that Matheson would pay these expenses in order for him to live in the house.

78. Matheson and Plaintiff did not have any agreement that Matheson would pay these expenses in order for him to live in the house, and Matheson did not pay rent to Plaintiff.

79. Matheson listed $3,800 as his monthly housing and utility expense incurred with respect to the Stillwater Property on his 2016 IRS Form 433-A.

80. Virginia Dombrowski wrote Plaintiff a $100,000 check on October 5, 2004. Plaintiff used this money to pay for living expenses.

81. On October 9, 2004, Plaintiff executed a promissory note in favor of Virginia Dombrowski promising to pay Virginia $90,000 plus 4% interest per annum.

82. On or about July 17, 2017, the IRS filed a Notice of Federal Tax Lien in the name of "Laura Dombrowski as nominee of Ronald Matheson," at the address of 54213 Stillwater Dr., Macomb, MI 48042, in the Macomb County Register of Deeds serial number 270585617, Liber 24850, Pages 76-77 (the "NFTL"), purporting to attach to all Dombrowski's "property and rights to property," including specifically the property located at 54213 Stillwater Dr., Macomb, MI 48042, as described in Exhibit A to the NFTL.

83. The NFTL was refiled by the IRS via the following recordings: (a) refile serial number 342578619, Liber 25869, Page 347; (b) refile serial number 417133820, Liber 27084, Page 783; and (c) refile serial number 423208120, Liber 27316, Page 448.

84. The nominee tax lien designates the "Taxpayer" as "Laura Dombrowski as a nominee of Ronald Matheson," with her residence listed as the Stillwater Property.

85. From approximately 2006 to 2013, Plaintiff was unemployed.

86. Dombrowski earned no wages during the time period 2006 to 2012. In 2013, she earned $1,332 in wages.

87. For the tax years 2013 to 2017, Dombrowski filed federal income tax returns and reported an adjusted gross income for each year as set forth in the table below:

| Tax Year | Reported Adjusted Gross Income |
|----------|-------------------------------|
| 2013 | $1,332 |
| 2014 | $11,951 |
| 2015 | $10,156 |
| 2016 | $9,525 |

| 2017 | $9,320 |
|------|--------|

88. For the tax years 2013 to 2017, Matheson filed federal income tax returns and reported an adjusted gross income for each year as set forth in the table below:

| Tax Year | Reported Adjusted Gross Income |
|----------|-------------------------------|
| 2013 | $59,528 |
| 2014 | $71,615 |
| 2015 | $79,096 |
| 2016 | $89,157 |
| 2017 | $92,825 |

89. Matheson's tax liabilities exceeded $3,237,039.91 at the time of his death.

90. Matheson was insolvent at the time he made the transfer, as he had millions in unpaid tax liabilities and mortgage payments due on the foreclosed Goulette Property, and Plaintiff had reasonable cause to know he was insolvent.

91. Matheson was the person paying the consideration for the 2013 purchase of the Stillwater Property; although Plaintiff maintains RRM Energy, LLC was the source, the record amply demonstrates that Matheson was the moving force behind the transfer.

92. Despite receiving several hundred thousand dollars from Plaintiff during the 2006 to 2010 time period, Matheson did not pay Plaintiff any interest on purported loans she gave him nor did he repay any money to her until he transferred money to her in June of 2013.

93. Even if the court accepted Plaintiff's characterization of Matheson's payments to Plaintiff as "loans," Plaintiff's asset picture at the time of the June 2013 transfer consisted of $10,427.09 in her bank account, and either $403,660 or

$404,660 owed to her by Matheson. The $403,660 or $404,660 amount is calculated from combining: (1) the initial $171,000 or $172,000 provided via the July 2006 check; (2) the 100% interest on the initial $172,000 (i.e., another $172,000) as stated in the promissory note; (3) the October 2006 check for $50,000; and (4) the December 2010 $10,660 check. In contrast to the $403,660 or $404,660 controlled by Matheson, Dombrowski had $10,427.09 in her bank account; thus, Matheson controlled 97.5% of Dombrowski's assets ($404,660 / ($10,427.09+$404,660)).

94. Matheson transferred $300,000 to an insider, Plaintiff.

95. Plaintiff was an insider of Matheson because of her close relationship to him, consisting of a nearly three decade-long personal, loving relationship and living together. Although Plaintiff, Mark Dombrowski, and Virginia Dombrowski testified as to how their relationship began to sour toward the end of Matheson's life, the record firmly establishes, by clear and convincing evidence, an extremely close relationship between Plaintiff and Matheson on par with a married couple.

96. Plaintiff, by clear and convincing evidence, was also an insider of Matheson because she was an "affiliate" of Matheson by virtue of the fact that Matheson controlled substantially all of Plaintiff's assets as of June 25, 2013.

97. Although Matheson owed Dombrowski either $403,660 or $404,660, and he had at least $692,531.95 in accounts under his sole control, he transferred to Plaintiff only $300,000, the exact sum necessary to purchase the Stillwater Property.

98. Plaintiff lacked the ability to make Matheson pay her any amounts he purportedly owed her.

99. The $300,000 used to purchase the Stillwater Property was funneled to her by Matheson for a short period of time for the sole purpose of purchasing the property.

100. Matheson transferred money in June 2013 to Plaintiff and Mark Dombrowski in an attempt to evade taxes by providing Plaintiff the funds to purchase the Stillwater Property in her name and thus avoid the large tax debts Matheson would have been forced to pay were he to purchase the property in his own name.

### III. CONCLUSIONS OF LAW

1. The United States supports its federal tax lien against Matheson under Michigan state law because state law determines the property interests of taxpayers upon which federal tax liabilities attach. *See United States v. Nat. Bank of Comm.*, 472 U.S. 713, 722 (1985) ("In the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property.") (quoting *Aquilino v. United States*, 363 U.S. 509, 513 (1960)).

2. "Once it has been determined that state law creates sufficient interests in the taxpayer to satisfy the requirements of the statute, state law is inoperative, and the tax consequences thenceforth are dictated by federal law." *Id.* (quoting *United States v. Bess*, 357 U.S. 51, 56-57 (1958)).

3.  The burden of proof for claims under MUVTA, Mich. Comp. Laws. §§ 566.35(1)-(2), is "preponderance of the evidence." *See id.* § 566.35(3).

4.  A "grantee need not personally participate in a fraudulent conveyance in order to be liable to a defrauded creditor." *Simon v. Gebremariam*, No. 353312, 2020 WL 10142203, at *4 (Mich. Ct. App. Dec. 10, 2020) (quoting *Regan v. Carrigan*, 194 486 N.W.2d 57, 58 (Mich. Ct. App. 1992)).

5.  Under the government's "insider transfer" theory, a "transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if [1] the transfer was made to an insider for an antecedent debt, [2] the debtor was insolvent at that time, and [3] the insider had reasonable cause to believe that the debtor was insolvent." Mich. Comp. Laws § 566.35(2).

6.  Mich. Comp. Laws § 566.31(h) provides the definition of an "insider" under MUVTA and lists a variety of specific categories of insiders. However, the statute states than an insider "includes" all of the categories listed. *Id.*

7.  The categories listed in Mich. Comp. Laws § 566.31(h) are merely "components of a whole" and serve as common examples of what constitutes an "insider." *See Grand Trunk W. R.R. Co. v. U.S. Dep't of Labor*, 875 F.3d 821, 824 (6th Cir. 2017) (quoting *King v. Burwell*, 135 S.Ct. 2480, 2489 (2015)) ("If the statutory language is plain, we must enforce it according to its terms.").

8.  The Michigan Court of Appeals has concluded that this particular language "is not limited to only the enumerated categories of what constitutes an 'insider' under [Mich. Comp. Laws §] 566.31 . . . particularly when it is clear that the [the statute] is designed 'to prevent debtors from transferring their property in bad

17

faith before creditors can reach it.'" *Schilkey v. Prosper Mgmt., LLC*, No. 327243, 2016 WL 6395595, at *3 (Mich. Ct. App. Oct. 27, 2016) (quoting *Dillard v. Schlussel*, 865 N.W.2d 648, 658 (Mich. Ct. App. 2014)); *cf. Wipfli v. Muha-Palmiter Tr.*, No. 285699, 2009 WL 2974766, at *3 n.3 (Mich. Ct. App. Sept. 17, 2009) (acknowledging that, while "not clear as a matter of law," it is "at least reasonably arguable" that the decedent's girlfriend could qualify as an insider).

9.  The non-exhaustive list defining "an insider" includes "a relative of the debtor," Mich. Comp. Laws § 566.31(h)(i)(A), as well as an "affiliate, or an insider of an affiliate as if the affiliate were the debtor." *Id.* § 566.31(h)(iv).

10. A "relative" is further defined as "an individual related by consanguinity within the third degree as determined by the common law, a spouse, or an individual related to a spouse within the third degree as so determined, and includes an individual in an adoptive relationship within the third degree." *Id.* § 566.31(o).

11.  An "affiliate" includes, in relevant part, "a person substantially all of whose assets are controlled by the debtor."  *Id.* § 566.31(a)(iii).

12. Under the government's "value transfer" theory, a "transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Mich. Comp. Laws § 566.35(1).

13.   "'Reasonably equivalent value' is a commercial concept." *Dillard*, 308 Mich.

App. at 459.  "The touchstone is whether the transaction conferred realizable

commercial value on the debtor reasonably equivalent to the realizable

commercial value of the assets transferred."  *Id.*

14.   "Claim" means "a right to payment, whether or not the right is reduced to

judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

disputed, undisputed, legal, equitable, secured, or unsecured." Mich. Comp.

Laws § 566.31(c).

15.   Michigan law recognizes resulting trusts. *See* Mich. Comp. Laws § 555.8.

16.   Although title in property generally vests in the grantee of the property, "[e]very

such conveyance shall be presumed fraudulent, as against the creditors of the

person paying the consideration; and when a fraudulent intent is not disproved,

a trust shall result in favor of such creditors, to the extent that may be

necessary to satisfy their just demands." *Id.*

17.   Michigan also recognizes common law constructive trusts. *See Cassidy v.*

*Cassidy*, 899 N.W.2d 65, 87 (Mich. Ct. App. 2017).

18.   "A constructive trust may be imposed where such trust is necessary to do equity

or to prevent unjust enrichment. . . . Hence, such a trust may be imposed when

property has been obtained through fraud, misrepresentation, concealment,

undue influence, duress, taking advantage of one's weakness, or necessities,

or any other similar circumstances which render it unconscionable for the holder

of the legal title to retain and enjoy the property. . . . Accordingly, it may not be

imposed upon parties who have in no way contributed to the reasons for

imposing a constructive trust. The burden of proof is upon the person seeking the imposition of such a trust." *Id.* (quoting *Kammer Asphalt Paving Co., Inc. v. East China Twp. Sch.*, 504 N.W.2d 635, 641-42 (Mich. 1993)).

19. "Similarly, an equitable lien exists in 'those cases where the party entitled thereto has been prevented by fraud, accident, or mistake from securing that which he was equitably entitled.'" *Id.* (quoting *Cheff v. Haan*, 257 N.W. 894, 896 (Mich. 1934)).

20. The scope of federal tax liens is broad and "meant to reach every interest in property that a taxpayer might have." *United States v. Craft,* 535 U.S. 274, 283 (2002) (internal citation omitted). This includes after-acquired property, *United States v. Dishman Indep. Oil, Inc.*, 46 F.3d 523, 525 (6th Cir. 1995), and property held by the taxpayer's nominee. *See G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51 (1977).

21. "The court shall, after the parties have been duly notified of the action, proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property, and, in all cases where a claim or interest of the United States therein is established, may decree a sale of such property, by the proper officer of the court, and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States." 26 U.S.C. § 7403(c).

## IV. APPLICATION OF LAW TO FACTS

In applying the law to the facts, the court has necessarily evaluated the credibility of the testimony of the witnesses. The court concludes that the government has

sustained its burden of proof by both a preponderance of the evidence and clear and convincing evidence. To satisfy Matheson's tax debts, the government may enforce its federal tax lien against the Stillwater Property.

1. The government has proven its "value transfer" theory under Mich. Comp. Laws § 566.35(1). While its burden was to prove the elements only by a preponderance of the evidence, the government has presented ample evidence to meet its burden by clear and convincing evidence.

2. There is no dispute that the government's claim arose before Matheson's 2013 transfer of $300,000 to Plaintiff or that he was insolvent at the time.

3. Matheson transferred funds to Mark Dombrowski and Plaintiff in quick succession for the exact amount needed to purchase the Stillwater Property. Mark Dombrowski immediately gave his portion of the money to Plaintiff to buy the home. The substance of the transaction was a transfer from Matheson to Plaintiff, using the RRM Energy Account and Mark Dombrowski as conduits.

4. Matheson did not receive "reasonably equivalent value" in exchange for the transfer. Although Plaintiff contends the transfers from Matheson were to satisfy loans made from Plaintiff to Matheson in the past, and that a dollar-for-dollar reduction in debt constitutes reasonably equivalent value, it is clear that these purported "loans" were not genuine. Instead, the $171,000 checks given to Matheson were actually intended to be capital investments in WALG. Plaintiff's testimony concerning her awareness of the money being used for WALG was not credible; the record establishes that she knew and intended on using the money as a capital investment.

5.   Matheson was never under a duty to repay this money to Plaintiff, her brother, or her mother,[2] evinced especially by the fact that Matheson never made any payments on the purported loan.

6.   Matheson did not receive any title interest in the Stillwater Property that he could alienate, dispose of, or devise—there was no realizable commercial value exchanged for the $300,000.

7.   The government is therefore entitled to enforce its tax liens against Matheson on the Stillwater Property because, under its "value transfer" theory pursuant to Mich. Comp. Laws 566.35(1), Matheson fraudulently transferred funds to Plaintiff so that she could buy the house in her name.

8.   While Plaintiff contends that she did make genuine loans to Matheson, and that Matheson's $300,000 transfer was made to repay antecedent loans, the government would still ultimately prevail. Indeed, even if the court accepted Plaintiff's position on this point, the government's "insider transfer" theory under Mich. Comp. Laws 566.35(2) would also entitle it to enforce the lien on the Stillwater Property.

---

[2]      Virginia Dombrowski's testimony further evinces that the payments of $171,000 and $172,000 were investments, not loans. Virginia testified that she did not like others in charge of her money and that, as a businessperson, wanted everything written down. Still, though, she did not seek any confirmation in writing that Matheson would repay her—if in fact, her transfer to Matheson was a loan, one would expect her to memorialize such a payment in a more formal writing. In this regard, she conceded that the promissory note written out to her was meaningless because she had never seen it before. Additionally, Plaintiff fails to explain why Virginia Dombrowski's purported "loan" to Matheson was never repaid, while Mark Dombrowski and Plaintiff received a repayment of $80,000 and $220,000.

9. Plaintiff was an insider of Matheson because she was an "affiliate" of Matheson. The pair were financially entangled, and Matheson exercised a great deal of control over Plaintiff and her assets. For example, her purported "loan" of $171,000 to Matheson completely drained her retirement savings. Matheson's "promise" to pay her back within approximately sixty days was far from realized; Matheson never paid her back. As a result, Plaintiff was assessed a tax penalty for making the early withdrawal from her account.

10. Plaintiff's over $400,000 in purported "loans" to Matheson were never paid for years. At the time of Matheson's transfer of $300,000, Plaintiff had $10,427.09 in her bank account. Plaintiff was also unemployed, and she reported her income as $1,332. Thus, at the time of the 2013 transfer, Matheson controlled about 97% of Plaintiff's assets. For years, Matheson had the power to decide whether to repay Plaintiff with little to no repercussions if he failed to do so. The only record before the court that Matheson ever attempted to repay Plaintiff prior to the 2013 transfer were checks that Matheson specifically instructed Plaintiff not to cash because they could not be honored. This single, purported "attempt" to pay her was meaningless. By clear and convincing evidence, the government established that Matheson controlled substantially all of Plaintiff's assets.

11. Plaintiff also, by clear and convincing evidence, was an insider under Mich. Comp. Laws § 566.31(h), largely akin to a "relative" of Matheson under § 566.31(h)(i)(A). Plaintiff and Matheson were extremely close. Their relationship was on par with that of a married couple, and Plaintiff even

characterized them as "beloved companions." Plaintiff acknowledged that their "very close, loving and personal relationship" lasted for over thirty years. Significantly, they lived together from 2006 until his death in January 2022. At Matheson's direction, Plaintiff quit her job to take care of the Goulette Property, to which they jointly held title. Shortly after the home was foreclosed on, they lived together again at the Stillwater Property.

12. The government has also shown that Plaintiff either knew or had reasonable cause to believe Matheson was insolvent at the time of the transfer. There is substantial evidence that demonstrates this element by clear and convincing evidence.

13. Plaintiff knew that Matheson had debts to settle with the IRS. For example, in 2010, Plaintiff was compelled to contribute $10,660 to Matheson so that he could use the money for an OIC to the IRS.

14. Matheson and Plaintiff jointly owned the Goulette Property. Matheson was responsible for making mortgage payments on the home, but PNC Bank foreclosed on the home.

15. Through the years, Plaintiff and Matheson were financially entangled. For example, they co-signed checks, signed insurance documents together, and jointly owned a truck.

16. During the time they lived together, Plaintiff and Matheson had a single mailbox, and Plaintiff collected and sorted the mail. The record demonstrates the IRS sent notices, such as notices of intent to levy, to Matheson between 2009 and 2013. Even if Plaintiff did not *open* the mail as she testified, she would have

reasonable cause to believe Matheson was insolvent. Plaintiff would have seen letters from the IRS, and given all the circumstances such as her previous payment to help pay for an OIC, she would have reasonable cause to know Matheson was not paying his tax debts as they became due. Moreover, Plaintiff's testimony that she never once opened or read Matheson's personal mail is not credible in the face of her testimony that she *had read* his e-mail communications.

17. The nature of Plaintiff and Matheson's relationship gives rise to a common-sense conclusion that they shared personal, sensitive information with each other. Indeed, during Plaintiff's testimony, she was acutely aware of Matheson's social security number, immediately confirming that she recognized it to be his. The existence of such a close, personal relationship amplifies the conclusion that Plaintiff had reasonable cause to believe Matheson was insolvent.

18. Plaintiff, on the one hand, testified that she believed Matheson was a successful businessman, in part because she had seen the headquarters of Auto/Con and was impressed by it. According to Plaintiff, the building was worth millions of dollars. Still, though, when Matheson presented her with large checks in 2007 for $389,000, $950,000, and $1,900,000, she did not believe any of them were legitimate.

19. Given their relationship, their cohabitation, the foreclosure of the Goulette Property, their years of financial entanglement, Plaintiff's general awareness of Matheson's tax liabilities, and Plaintiff's refusal to believe Matheson could legitimately issue a check for hundreds of thousands of dollars, the record firmly

establishes that Plaintiff had reasonable cause to believe Matheson was insolvent.

20. The government also must prevail because the Stillwater Property is subject to a statutory resulting trust.

21. The record demonstrates that Matheson's payments to Plaintiff and Mark Dombrowski were a sham. They were not repayments for prior loans, but rather, were an attempt to protect his assets from tax liability.

22. Plaintiff claims that she loaned Matheson approximately $221,000 in 2006 and $10,600 in 2010, while Plaintiff's brother lent Matheson $172,000 in 2006 and $10,000 in 2007. But for years, Matheson did not repay any amount of the purported loans made by Plaintiff or her brother. Only one "attempt" was made to repay these loans, but Matheson told Plaintiff not to cash the checks because they could not be honored. Nor did Plaintiff even believe that she could cash these checks because they were for so much money.

23. Neither Plaintiff nor Mark Dombrowski had a legitimate expectation of being repaid by Matheson. The payments made to Matheson were not loans, and there was no legitimate expectation of repayment. Plaintiff did not receive repayment within the sixty days after she drained her retirement account, nor did she receive it on the maturity dates listed on the promissory notes.

24. Just before the transfers at issue in 2013, Matheson defaulted on his mortgage, and the IRS had just refused Matheson's OIC to settle his outstanding tax debts. Thus, at the same time Matheson may have been looking for a new home to reside, he transferred—through his own check and through Plaintiff's

brother—to the woman with whom he was living the exact sum of money necessary to purchase a new home. Plaintiff then purchased the new home in her own name, thereby avoiding massive tax debts Matheson would still have been forced to pay were he to have purchased the home himself.

25.   The $300,000 was, in fact, Matheson's. Matheson paid the consideration for property titled in Plaintiff's name.

26.   Plaintiff has not provided credible evidence to rebut the conclusion that the $300,000 was a sham transfer; a resulting trust attaches to the Stillwater Property under Michigan law.

27.   The court need not reach the question of the applicability of a constructive trust. But the record indeed demonstrates that, in equity, a common law constructive trust arises due to Matheson's acquisition of the Stillwater Property through Plaintiff and Mark Dombrowski. Matheson was the individual paying the $300,000 to Plaintiff, and he enjoyed the benefit of residing in the Stillwater Property once she purchased it. Between the timing of the purchase—including the transfer of the exact sum necessary for the purchase of the home—and Plaintiff's knowledge of Matheson's insolvency, it is apparent that Matheson used Plaintiff and Mark Dombrowski as conduits to purchase the Stillwater Property and conceal it from the government. Plaintiff and Mark Dombrowski were complicit and even participated in Matheson's plan to do so.

## IV. CONCLUSION

The government has met its burden by a preponderance of the evidence, and at least as to its "value transfer" and "insider transfer" theories, it has done so by clear and

convincing evidence. The government will therefore be entitled to enforce any liens against the Stillwater Property and have it sold at a judicial sale to satisfy Matheson's tax debts. Judgment will follow separately. Accordingly,

IT IS ORDERED that the parties are DIRECTED to submit a proposed order of judgment, stipulated as to form, by **June 21, 2022**.

s/Robert H. Cleland                              /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  June 8, 2022

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, June 8, 2022, by electronic and/or ordinary mail.

s/Lisa Wagner                                  /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\18-11615.DOMBROWSKI.FoFCoC.MAZ.RHC.docx